## 10057.　DANCE *v.* CITY OF ROME.

There was no demurrer to the petition; and there being evidence tending to establish all its material allegations, as to damage to the plaintiff by reason of changes made by the city in the sidewalk and ditch in front of her premises, the case should have been submitted to a jury, and the court erred in directing a verdict for the defendant.

DECIDED APRIL 17, 1919.

Action for damages; from city court of Floyd county—Judge Nunnally. August 12, 1918.

*J. W. Ewing, Dean & Dean,* for plaintiff.

*Max Meyerhardt,* contra.

WADE, C. J. Mrs. Regina Dance, as the owner of a house and lot (known as No. 4) on the south side of Blanche Avenue, about 15 or 20 yards from the corner of South Main street, which avenue now is and has been for a number of years one of the streets of the City of Rome, under its control, supervision, and dominion, brought suit against the city for damages, and in her petition alleged: That during the year 1915, South Main street (which is between Blanche Avenue and Glover street) was, because of certain construction work, "torn up" and in such condition that the traveling public were forced to make exclusive use of Blanche Avenue and Glover street in going to and from East Rome, and that this condition continued for a number of weeks; that during the course

of the construction work on South Main street the city elevated
the road-bed in front of her house and with its heavy wagons
traveled over the sidewalk upon which her property fronted, and
permitted other vehicles to do the same, causing the sidewalk to be
lowered to a level with her lot; that prior to the improvement work
on South Main street there was a ditch or gutter running along
the sidewalk in front of her house, amply sufficient to drain and
carry off all the water that naturally flowed down Blanche Ave-
nue, but that the heavy travel on said avenue, due to the said work
on South Main street, eliminated her sidewalk and caused the ditch
to fill up, so that water, after every hard rain, was forced upon
her lot, damaging her property and her family; that this condition
existed for more than a year, notwithstanding she had, through her
husband, repeatedly requested the officers and agents of the munici-
pality to remedy the evils complained of; that she suffered several
attacks of malarial fever, caused by the constant overflow of her
premises and the ponding of water thereon; that the city, having
constructed the sidewalk and ditch in front of her house, was legally
bound to keep the same in such a condition as to protect her
property; that the defendant's negligent and wrongful acts afore-
said damaged the market value of her property, as well as its rental
value, and caused her physical and mental pain and suffering; and
that notice of her claim for damages was duly served upon the
city before this suit was brought. The defendant filed a plea deny-
ing liability for the injuries complained of. The case went to
trial, and, at the conclusion of the evidence for both sides, the court
directed a verdict for the defendant. To this the plaintiff excepted.

The sole question for adjudication is, therefore, whether there was
sufficient proof of the case as made by the pleadings to require its
submission-to a jury. As to the construction by the city of the side-
walk and ditches in front of. her property, the plaintiff testified:
"That sidewalk and ditch in front of my house the City of Rome
built and dug. They had been there for years. I have been there
for 18 years, and there was a sidewalk there when I moved there.
That sidewalk had been maintained by the City of Rome all during
that time, from the time I first moved there until now, and the
ditch in front of my house also." The witness Coppage testified:
"In 1901 and 1902 I worked for the City of Rome on
the streets. I was foreman of a gang on the street, a street-gang.

At that time Mr. Hanks was mayor and Mr. Pollock was chairman of the street committee, and he saw me one afternoon and told me to take the gang over there on Blanche Avenue and clean out those ditches,—Mr. Pollock told me that. Mr. Pollock's position, with reference to the city at that time, was that of chairman of the street committeee of the council, and I went and opened those ditches on both sides of Blanche Avenue. That was about 1902. I put the ditches a great deal lower than the sidewalk, and built the sidewalk up as I cut the ditches." "If a municipal corporation negligently constructs a system of sewerage or drainage, or negligently maintains one properly constructed, so as to injure private citizens or their property, it will be liable in damages for the injury thus occasioned." *Langley* v. *Augusta,* 118 *Ga.* 590, 598 (45 S. E. 486, 98 Am. St. R. 133). The allegation in the petition, that the sidewalk and ditches in front of the plaintiff's property were, prior to the work done on South Main street, sufficient to carry off the water which naturally flowed down Blanche Avenue, was supported by her husband's testimony: "Up to the time the city began to make these improvements on Main street, the condition of those ditches on each side of Blanche Avenue, as to carrying off the water, was that they were kept cleaned out and were thoroughly equipped to take off the water as it ran down along Blanche Avenue, going towards Silver Creek. The water has never run out of Blanche Avenue onto my wife's lot when the ditches were clean. Those ditches had been sufficient, up until then, to carry all the water that came, except one time, about 6 or 8 years ago. . . After those repairs on Main street began was the first time it had been wet under the house. The brick began to crumble under the house,— began to sink, and the plastering cracked and tore our paper off. The water ran under the house, up three fourths of the way." The plaintiff testified: For 18 years "that ditch served to keep the water away from me. As long as they kept that ditch open it carried all that water off down Blanche Avenue towards Silver Creek. . . The water would not have gotten into my lot if the sidewalk h. 1 not been lowered, and the sidewalk was lowered on account of the traffic, because the East-Rome bridge was closed up, and that is what caused the water to get on my lot. . . The water would stay underneath the house, and it molded my carpets and mattings, and cracked my walls, and the plastering in places fell off, and the floors were warped also on account of this

water. Those things had never happened before that time. Wagons traveled over the sidewalk—the general public and the city wagons traveled over it, they did too; in filling up there in the street, filling with crushed rock." Captain J. W. Ewing testified: "I found the sidewalk in front of her [the plaintiff's] house had been almost eliminated. The baseboard or plank upon which the fence rests is there to show for itself, where it had rotted down, how high the dirt came up on the sidewalk. The sidewalk, I would say, was at least eight or nine inches higher before they began work on South Main street than it is to-day, or than it was when I brought this suit [as attorney for the plaintiff]. The ditch or gutter had all been filled up at the time this suit was brought. It sloped from the middle of the street into her lot; that is, the middle of the street was then higher than her lot in front of her house. The ditch had been filled up and there was a slope into her lot, across from the middle of the street. . . The whole trouble, I want to state, is that,—the elimination of that sidewalk. If that sidewalk had not been disturbed, the water would not have gotten over it. Even if the ditch had been filled up, if that sidewalk had been left as it was, the water was bound to have gone on down Blanche Avenue to Silver Creek. I know what reduced that sidewalk. I saw it, saw the heavy wagons going over it, with iron rims on the wheels, and it would pick up the dirt off the sidewalk and carry it off. Travel was congested at that time. The East Rome bridge was down. . . They didn't travel Main street, because they could not get along there. I have been there, had trouble getting along there on foot, it was so filled up with wagons, repair wagons for the city or county. They were repairing Main street and putting down rock in the middle of the street. The City of Rome was doing the work."

The witnesses W. A. Dance, his wife, W. T. Andrews, and J. W. Ewing all testified that the market value of the plaintiff's property had been diminished one half or more by reason of the elimination of the sidewalk and ditch in front of her house. There was also evidence from the plaintiff to the effect that the rental value of her property had diminished about one half. She testified also that prior to the flooding of her property with water there were practically no mosquitoes about the premises, and she had never been sick with malaria or other disease. Dr. Wicker testified, that

malaria was caused by a mosquito bite; that persons living near the breeding places of mosquitoes were more likely to become inoculated with malarial poison; that he had known the plaintiff for a number of years, and that she had never been sick prior to the time she had malaria, and that he attributed her malaria attack to poison from mosquito bites.

As to whether the city had notice of the defective condition of the sidewalk and the ditch in front of his wife's house, Dance testified: "When that gutter got filled up, and with the view of having it cleaned out, I went to Mr. Gammon, after the construction was over with, went to him and asked him—he was our head commissioner then. (Admitted by defendant that Gammon was chief commissioner of the city at that time.)  I went to him and complained about it, and he said he would have some men to clean it out.  I explained the condition and what caused it, told him they had made a road out of my sidewalk, and that the sidewalk was lower than the street, and the ditch that they had there was filled up, and that I wished he would go there and throw the dirt out of the ditch onto the sidewalk and raise it up, and told him the water was damaging me; and he said, 'I will have it done to-morrow.'  I don't remember the date when I told him this, but immediately after they finished up so that Main street could be traveled.  Two or three days passed and nobody came, and I went to him again, and he said 'I will send Mr. Booz out there.'  No one came, though, and I went back to him, and this time he says, 'I will have a man out there to-morrow;' says 'I have been pushed up so I have not had a chance to do anything.'  I waited two or three days on him, and there was still nothing doing, and I went to the waterworks hunting for Mr. Booz, but I could not find him, and I left a notice there with the waterworks man where Mr. Booz had his office, and he made a minute of it and put it on Mr. Booz's desk, and I left three notices there for him to have it cleaned out, and then I went back to Mr. Gammon, and it hadn't been cleaned out then. . .  Went there four times to see him personally, and then I went there and left the notices."

The contention that the sidewalk in front of the plaintiff's property was lowered by the public traveling over the sidewalk, and that therefore the city was not liable, is without merit.  If this contention were legally sound, it would be irreconcilable with the

well-settled principle that it is the duty of a municipality to main-
tain its streets and sewerage systems and keep them in repair so
as to prevent damage to owners of abutting property, provided, of
course, the municipality has notice or reasonable opportunity or
time in which to acquire notice of the defective condition. *Langley*
v. *Augusta*, supra; *Massengale* v. *Atlanta*, 113 *Ga.* 966 (39 S. E.
578); *Mayor &c. of Brunswick* v. *Tucker*, 103 *Ga.* 233 (29 S. E.
701, 68 Am. St. R. 92)'; *City of Atlanta* v. *Trussell*, 21 *Ga. App.*
340, 345 (94 S. E. 649).

There being no demurrer to the petition, and the evidence above
narrated having tended to prove all the material allegations thereof,
the trial judge erred in directing a verdict for the defendant. '

> *Judgment reversed. Jenkins and Luke, JJ., concur.*